# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

In re:

Med Diversified, Inc., *et. al.,*

        Debtors.

_____

CHARTWELL LITIGATION TRUST and
GREGORY L. SEGAL AS TRUSTEE OF
CHARTWELL LITIGATION,

        Plaintiffs,

        v.

ADDUS HEALTHCARE, INC., an
Illinois Corporation; W. ANDREW
WRIGHT, an Illinois Individual; MARK
S. HEANEY, an Indiana Individual;
COURTNEY E. PANZER, an Illinois
Individual; and JAMES A. WRIGHT, an
Illinois Individual,

        Defendants.

-------------------------------------------------------x

*FOR PUBLICATION*

Case No.:   02-88564
           02-88568
           02-88570
           0288572
           02-88573

Adv. P. No.:  04-08680
Chapter 11

Appearances:

Howard J. Steinberg, Esq. (pro hac vice)
Michael H. Strub, Jr., Esq. (pro hac vice)
IRELL & MANELLA LLP
Co-counsel to the Plaintiffs
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276

Scott E. Early, Esq. (pro hac vice)
Ellen Wheeler, Esq. (pro hac vice)
Jill L. Murch, Esq. (pro hac vice)
Christopher J. Werner, Esq. (pro hac vice)
FOLEY & LARDNER LLP
Counsel for the Defendants
321 N. Clark Street, Suite 2800
Chicago, Illinois 60610

**MEMORANDUM OF DECISION AND ORDER**

# Introduction

In a prior decision[1], the Court disqualified the defendants' witness, Scott P. Peltz, C.P.A., from submitting a report and testifying as an expert on (1) the total enterprise value of the defendant Addus Health Care, Inc. (Addus), a privately held company, as of January 8, 2002, and (2) the exchange value of an alleged six and a half month option and/or extension agreement between Addus, as seller, and the debtor, Med Diversified, Inc. (Med D) as purchaser, for which Med D paid $7.5 million to purchase 100% of Addus' shares, as framed by an unsigned First Amendment to the Stock Purchase Agreement (First Amendment).

### A.  Contentions of the Parties

If the $7.5 million were treated as the purchase price for an option, the "strike" or "exercise price" for the shares under the Stock Purchase Agreement would have been not less than $119.9 million.[2]   The plaintiffs sought to prove that the fair market value of the shares as of January 8, 2002, the date of the execution of the Stock Purchase Agreement, was $21 million, based solely upon the enterprise valuation according to its proposed expert, Robert J. Cimasi (Cimasi).  If this valuation of the shares were adopted by the Court, the plaintiffs argue that this Court would then necessarily have to find and conclude

---

[1] *Chartwell Litigation Trust v. Addus Healthcare, Inc. (In re Med Diversified)*, 334 B.R. 89 (Bankr. E.D.N.Y. 2005).

[2] The parties disagree on what the strike price was, but the evidence suggests it was at least $119.9 million.

2

that the $7.5 million payment for the option and/or extension agreement was not for reasonably equivalent or fair value.[3]    Alternatively, the plaintiffs argue that since the First Amendment was never authorized by Med D's board of directors and never signed by Med D's CEO, then the $7.5 million is recoverable as an *ultra vires* payment, and it does not matter what the value of the option and/or extension may have been worth if the payment had been authorized.

The defendants counter by averring that the First Amendment was substantially performed and that the $7.5 million payment is not recoverable.  Moreover, the defendants further aver that Med D's board did authorize the CEO to enter into any further agreements to implement the Stock Purchase Agreement before the $7.5 payment was made, or ratified it immediately thereafter.  Finally, the defendants aver that the value of the shares, according to its expert, was at least $89 million as of February 14, 2002, and that an option price of $7.5 for a six and a half month period was for reasonably equivalent or fair value.[4]

### B.  A Summary of the Discussion

The Court now turns to the defendants' cross-motion *in limine* to deny admission of the expert report and testimony of Cimasi on the ground that in applying the standard

---

[3]It should be noted that both parties stipulated that Med D was insolvent on January 8, 2002 and on February 14, 2002.

[4]The defendants would prefer that this Court ignore the statement by its expert witness on the stand that it would not make any business sense to pay $7.5 for an option if the value of the business were $89 million and the strike price were $119.9 million.   Ironically, since the Court struck Peltz' report and testimony as unreliable in granting the plaintiffs' motion *in limine*, the plaintiffs cannot rely upon Peltz' statement.  In point of fact, Peltz completely lacked the expertise to make an enterprise valuation, so anything he said about value was inadmissible.   In its present thinking, the Court is unlikely to preserve this terribly prejudicial statement from the struck testimony as a party admission.   In any event, the determination of the merits of the plaintiffs' complaint, amended to conform the pleadings to the proofs, awaits another day.

methodologies for an enterprise valuation of Addus, he exhibited such a deliberate, manifest, pervasive, and systematic bias in selecting his data points, in adjusting the data points, and in assigning weights to the data points in order to drive his valuation opinion toward its lowest levels that his report and testimony have to be excluded as fundamentally unreliable.

After reviewing all of the evidence, the Court has determined to grant the defendants' cross-motion *in limine* and exclude Cimasi's expert testimony and report. As this memorandum amply attests, the deliberate, manifest, pervasive and systematic bias on Cimasi's part in applying the standard methodologies for estimating the total enterprise value of Addus warrants disqualifying him and his report on the principal ground of unreliability. The Court has taken considerable pains to point out the myriad ways in which Cimasi deliberately drove his adjustments of the discount rate and other variables toward the lowest order of value in order to accomplish his client's implicit bidding, notwithstanding his protestations of objectivity. Perhaps this memorandum of decision may assist other bankruptcy courts in framing their decisions on motions *in limine* under the evolving standards of disqualification of purported non-scientific expert witnesses under the United States Supreme Court's *Kumho* decision with respect to financial matters.

# **Background and Procedural History**

The background to this adversary proceeding was discussed at length in the Court's prior Memorandum and Decision,[5] and this Memorandum of Decision "presupposes familiarity" with the prior Memorandum, part of which is reproduced here as a matter for the reader's convenience.   The relevant transactional history is this:  On January 8, 2002, Med D and Addus entered into a Stock Purchase Agreement (SPA) in which Med D agreed to purchase all of the privately held shares of stock of Addus.  On January 24, 2002, the parties executed a Modification to the SPA under which the sales price was set at approximately $119.9 million.  Under the Modification, the closing date for the transaction was scheduled for February 14, 2002.

What happened next is in material dispute.[6]  The parties agree that sometime before February 14, 2002, Med D and Addus began negotiating a further "amendment" to the modified agreement.  This amendment was purportedly memorialized in a document entitled First Amendment to the SPA (First Amendment), *but this document was never signed by the parties*.   The First Amendment purportedly gave Med D an "option" to purchase all of the Addus shares at anytime before September 1, 2002 -- a six and a half month period -- for $7.5 million.  Alternatively, this $7.5 million may also be deemed a payment in consideration for an extension of time for Med D to perform its obligations under the Modification.   The $7.5 million was to be released from the joint escrow account upon the joint execution of the First Amendment and paid to the defendants.  In

---

[5] *In re Med Diversified, supra* (granting in part and denying in part the plaintiffs' motion *in limine* to exclude the expert report and testimony of defendants' expert, Peltz, on the value of Addus).
[6] The resolution of this dispute has yet to be determined.

simplified terms, under the First Amendment, Med D lost its right to a credit against the

Exercise Price or Purchase Price of approximately $1 million of the $7.5 million upon

expiration of each successive month until the total amount was exhausted at the end of

the six and a half-month period.  If the First Amendment were valid and enforceable -- an

issue to be determined at the conclusion of the trial -- then Med D's failure to close the

acquisition by the end of this 6 ½ month period would have the effect of Med D

forfeiting any right to recover any part of the $7.5 million.

On February 13, 2002, from the $15 million on deposit under the joint escrow

account, $7.5 million was transferred to Med D, and $7.5 million was released to Addus

and/or the defendant W. Andrew Wright (Wright).  In fact, all of the $7.5 million was

immediately transferred to Wright.  Within a very short period of time, he advanced $4

million of these proceeds to Addus for its urgent working capital needs, and used the $3.5

million balance for his other personal investments that were unrelated to Addus.   Med D

did not close the deal to purchase Addus by August 31, 2002, and the defendants retained

the $7.5 million.

Within a month after the joint escrow was distributed to the parties, Med D filed

an action, based upon common law or state law claims, against the defendants in the

Superior Court of California, Central District, in the County in Los Angeles, seeking,

among other things, return of the $7.5 million.[7]   That action was quickly dismissed by

the plaintiffs and then refiled as an amended complaint.  That amended action was

removed to the Federal District Court for the Central District of California, Western

---

[7] *Med Diversified, Inc. v. Addus Healthcare, Inc.*, Case No. BC272609.

Division, sitting in Los Angeles.[8]  That action was removed once again to the Federal District for the Northern District of Illinois (the Chicago Action).[9]  Med D and several, but not all, of its affiliates filed petitions for relief with this Court in late November of 2002, under chapter 11.   The Chicago Action lay dormant by mutual agreement of the parties pending the confirmation of a plan of reorganization or liquidation by Med D and its affiliates.

Under the terms of the Second Amended Plan of Reorganization, the debtor's pre-petition claims, including those against the defendants, were assigned to the newly formed Chartwell Litigation Trust.   On November 24, 2004, the plaintiffs filed the complaint beginning this adversary proceeding, alleging claims arising under the Bankruptcy Code as well as related state law claims.   The principal claim is that the pre-petition payment of $7.5 million from Med D to the defendants can be recovered by the estate either because it was for no value whatsoever, assuming the First Amendment never became valid and enforceable, or, alternatively, because it was not for reasonably equivalent value.   The defendants have also raised counterclaims alleging actual and consequential damages from an alleged breach of contract under the SPA, as modified.

In their pretrial statement, the plaintiffs listed Cimasi as their expert on business valuation, and filed a motion *in limine* to exclude all of the testimony of defendants' expert on business valuation, Scott P. Peltz (Peltz), on the ground that he does not qualify as an expert on valuation of all of the shares of a privately held health care services company.   The defendants then filed a cross-motion to exclude the testimony of

---

[8] Case No. CV-02-03911 AHM (JTLx).
[9] Manning, J.

plaintiffs' expert on business valuation, Cimasi, on the ground that his expert report and

testimony are unreliable because the methodology used by Cimasi in placing a value on

Addus was flawed.  In support of their motion, the defendants point to numerous alleged

flaws in all three valuation methods used by Cimasi, as well as in the compilation of data

supporting these methods.

## <u>Discussion</u>

To be admissible, expert testimony must be relevant and must rest on a reliable

foundation.[10]  *See Amorgianos v. National R.R. Passenger Corp.*, 303 F. 3d 256, 265 (2d

Cir. 2002)(relying on *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597

(1993)).  Testimony is relevant if it "has any tendency to make the existence of any fact

that is of consequence to the determination of the action more probable or less probable

than it would be without the evidence."  Fed. R. Evid. 401.

Under Rule 702 of the Federal Rules of Evidence, testimony is reliable if: "(1) the

testimony is based upon sufficient facts or data, (2) the testimony is the product of

reliable principles and methods, and (3) the witness has applied the principles and

---

[10] Under Fed. R. Evid. 702, an expert must also be qualified as an expert in order for his or her testimony to be admissible as expert testimony.  The Court found that Cimasi was qualified as an expert and defendants did not take issue with his qualifications in this motion.

methods reliably to the facts of the case." Fed. R. Evid. 702[11]  In determining reliability, the trial court must undertake a flexible inquiry that should "focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the . . . court's belief as to the correctness of those conclusions." *Amorgianos* at 266.

While the Court has a duty to admit expert testimony that is reliable and will assist the trier of fact, *Daubert* also charged the Court with a duty to "ensure that the courtroom door remains closed to junk science." *Amorgianos* at 267.  Accordingly, the trial court acts as a gatekeeper by ensuring that *every step* of the expert's analysis is reliable. *Id.*  Acting in its gatekeeper role, the trial court has a duty to "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.*

Under the first prong of the reliability assessment under Rule 702, the trial court must examine the sufficiency of the data or studies underlying the expert's opinion.  If the Court concludes the studies or data upon which the expert relied are insufficient to

---

[11]

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony, and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

support the expert's conclusions, the Court has a duty to close the gate on admission of the evidence as unreliable. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146-47 (1997).

Under the second prong of the reliability assessment under Rule 702, the trial court must determine whether the methods used by the expert are reliable. In doing so, the Court may look to a number of factors, including: (1) whether a theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error and the existence and maintenance of standards controlling the techniques operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. *See Daubert* at 593-94; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999).

Even if the Court concludes the data was sufficient and the methodology used by the expert was reliable, the inquiry does not end there. Under the third prong of the reliability assessment under Rule 702, the Court must also examine how that methodology was applied *See Lippe v. Bairnco Corp*., 288 B.R. 678 (S.D.N.Y. 2003), *aff'd*, 99 Fed. Appx. 274 (2d Cir. 2004) (excluding expert testimony partly because of how the expert applied the methodology).

Further, the trial court must determine whether the methodology was appropriately applied to the data at issue. The testimony must be "sufficiently tied to the facts of the case that it will aid the [trier of fact] in resolving a factual dispute." *Daubert*

at 591 (quoting *United States v. Downing*, 753 F.2d 1124, 1142 (3d Cir 1985)).  This consideration was described by the *Daubert* Court as "fit," and is "another aspect of relevancy." *Daubert* at 591.  Simply because a method is valid for one purpose does not mean it is valid for another. *Id*.  "A court may conclude there is simply too great an analytical gap between the data and the opinion offered." *Joiner* at 146.

If the court determines that the data, methodology or studies upon which the expert's opinion is based are inadequate to support the expert's conclusions, the court must exclude the expert's testimony. *Id*. at 266.  While minor flaws will not automatically bar expert testimony, the court must exclude the evidence "if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id* at 267 (quoting *In re Paoli R.R. Yard PCB Litig*., 35 F.3d 717, 745 (3d Cir. 1994)).

## <u>Findings of Fact</u>

As a preface to this part of the Court's Decision, this case presents a vexing intuitive difficulty.  The audited financial statements for Addus for the calendar year of 2001 report $234,070,611 in gross revenues, yet due to the alleged non-recurring adjustment of approximately $13 million in allowances for doubtful receivables and reserves for workers' compensations insurance in Addus' Home Medical Equipment Division, the earnings before interest, taxes, depreciation and amortization was negative for the year at $157,340.  No matter what industry multiple was used for estimating the value of Addus based upon the standard metric of EBITDA (earnings before interest, depreciation, taxes, and amortization), quite apart from the disconcerting disparity

11

between Peltz' valuation of $89 million and Cimasi's valuation of $21 million, the Court had serious reservations how, based upon a negative EBIDTA number, the company could have any positive value. According to the old math, (0) x (n), with n = EBITDA, is always 0.

Of course, one could avoid this estimation of "no value" by using a base for computing value other than EBITDA, or one could materially adjust EBITDA to remove the allegedly one-time or non-recurring adjustments, especially in a discounted cash flow valuation, and to make other adjustments to "normalize" other expenses, such as reducing excessive executive compensation. In this case, Cimasi's discounted cash flow valuation is predicated upon "free cash" or "unlevered cash" flow of the "subject company" for a four to five year projected period, discounted to present value, following the 2001 calendar year, and then adding the terminal value, which is again discounted to present value, and adding these two components of value to arrive at the enterprise value. But it is not this Court's function to perform an analysis that saves the plaintiffs' case in chief (or the defendants' answer, affirmative defenses, and counterclaims, for that matter) from the unreliable and excluded testimony of the plaintiffs' expert on valuation (or the defendants' expert). If a party does not sustain its burden of proof because its expert's report and testimony are excluded, then the conventions of American civil trial practice have to be respected: a judgment has to be entered for the defendants. However tempting it may be for a bankruptcy judge to show the parties how the valuation analysis should be done, a bankruptcy judge has to direct the law clerks to tie up the judge to the mast like Ulysses and plug the judge's ears from heeding the Sirens' calls.

With this as background, Cimasi used three different methods of valuation to support his conclusion that Addus was worth only $21 million at the time the parties entered into the transaction for the sale of Addus to Med Diversified (Med D) for approximately $119 million: (1) the discounted cash flow (DCF) method; (2) the Guideline Company Valuation (GCV) or Comparable Company method; and (3) the Direct Market Comparable Transactions (DCT) or Comparable Transaction method. *See* "Valuation Related to Addus Healthcare, Inc., as of January 8, 2002", by Robert James Cimasi, dated July 11, 2005 (Cimasi Report). Each of the three methods yielded different values for Addus: (1) the DCF method yielded a value of $18,772,961; (2) the GV method yielded a value of 26,108,195; and (3) the DCT method yielded a value of $20,830,171. *See* Cimasi Report at Section 5, p. 26 of 28. After considering the limitations of each method, Cimasi determined that the results reached using the DCF method should constitute 60% of the value determination, the GCV method results should represent 30%, and the DCT method results should make up only 10%. Accordingly, he arrived at a weighted average value for Addus of $21 million.

## I.    The Benchmarking Analysis

A benchmarking analysis compares the historical performance of the company to that of companies in the same industry and is used as a tool to measure the relative risk of the investment. *See* Cimasi Report, section 5, at p. 2 of 28. Cimasi performed a benchmarking analysis for Addus and used portions of this analysis in his DCF analysis.[12] He also used results from his benchmarking analysis in his GCV anaysis,

---

[12]Cimasi used results from the benchmarking analysis in his calculation of (1) the cost of sales and operating expenses component of Addus's projected net cash flow; (2) the cost of equity component of the discount rate; and (3) the weight of equity and debt components of the discount rate. *See* Tr., August 26,

based upon which he determined that Addus's performance was comparable to companies who performed in the lower quartile performance range.

Unfortunately, Cimasi's benchmarking analysis relied heavily on a very small database of publicly held companies and was applied in a manner that was skewed to disfavor Addus, thereby rendering not only the benchmarking analysis unreliable, but also tainting his DCF and GCV analyses.

Cimasi's benchmarking analysis compared Addus's performance to the weighted average performance results from: (a) the 10k Reports from 13 public companies,[13] and (b) two studies of private companies in the same industry (RMA & Integra studies).[14] *See* Cimasi Report, Table 3. Based on these comparisons, he concluded that Addus was "less profitable, solvent, efficient and more leveraged than the industry benchmarks." Cimasi Report, Section 5, p. 2 of 28.

In performing his analysis, Cimasi assigned weights to each of the public companies and each of the two studies used in the benchmarking analysis, which were based on his admittedly subjective determination of how similar the companies were to Addus with respect to the specialties of each of the companies, the types of services they

---

2005, at p. 223.

[13] The 13 public companies compared were: Almost Family, Inc.; Amedisys, Inc.; American Home Patient, Inc.; Apria Healthcare, Inc.; Coram Healthcare, Inc.; Gentiva Health Services; Lincare Holdings, Inc.; Mid-Atlantic Home Health Network, Inc.; National Home Health Care Corporation; New York Health Care, Inc.; Option Care, Inc.; Pediatric Services of America, Inc.; and Transworld Healthcare, Inc.

[14] The two private company studies utilized by Cimasi in his analysis were: (1) "Business Profiler" (2001), by Integra Information, Inc., which gets its information from a number of government surveys of closely held businesses, *see* Tr., Aug. 26, 2005, at p. 165; and (2) "Annual Statement Studies" (2001/2002) by Risk Management Association (RMA), which gets its information from financial statements submitted in support of bank loans. *Id*. at 168.

provided, and the size of each company. *See* Tr., August 26, 2005, at p. 170-71. During his testimony, he stated the weighting process was "not a purely empirical scientific formulaic process," and that there were "subjective considerations in trying to apply that weighting." *Id.* Based on such subjective considerations, he chose to assign a weight of 2 to the values obtained for the RMA and Integra studies, the only private company data used by Cimasi, even though this weight was lower than the weights assigned to 7 of the public benchmark companies, which were 4 or 5. *See* Cimasi Report at Table 3; *see also* Tr., Aug. 29, 2005, at p. 35. This weighting scheme had the effect of favoring a small database of publicly held companies and suppressing the data from the two private company studies.

Cimasi based his benchmarking analysis on only 15 samples, and 86% of the data upon which he drew inferences was from 13 public companies. He also excluded certain "outliers" and negative ratios from portions of his analysis, which, apart from skewing the data, further narrowed the already objectionably small sample size. In some instances, these exclusions resulted in inferences being drawn about Addus's financial performance based on as few as seven public companies.

As reflected in the record of Cimasi's testimony, the Court repeatedly questioned the reliability of drawing inferences from such a small sample size. Cimasi did not satisfy the Court that the "peer-reviewed literature" accepts a sample size of carefully selected public or private companies as few as three or four. But more fundamental is the Court's skepticism that it is methodologically sound to compare the data from public

companies with that of a closely-held private business.[15]    That is a huge quantum leap that this Court is unwilling to make.  The literature cited by Cimasi is severely limited and little of it appears to satisfy the rigorous standard of peer-reviewed publications.  The dominant citations are to the writings of two or three consulting firms which hold themselves out as valuation experts either by self-designation or by designation through the very small professional valuation societies they have formed for themselves.   This is evidenced by the number of acronyms for the six professional designations Cimasi adds after his name, each of which is awarded by one of these professional valuation societies.[16]

Cimasi also excluded extraordinary and nonrecurring events from the operating expenses of the benchmarking companies, but not from Addus's operating expenses.  He testified that he did not normalize the data for Addus in the benchmarking analysis because it is customary to do the benchmarking first, and then use the results to determine how to normalize. Tr., August 29, 2005, at p. 50.  However, as set forth below in more detail, his failure to normalize the data for Addus had a disproportionate negative impact on a number of critical variables in his DCF and GCV analyses that were not adequately supported by any of his explanations.[17]  His failure to normalize the data for

---

[15]Although some of the data came from two studies of closely held healthcare companies, the Court was given no specific information about the private companies represented by these two studies.

[16]Cimasi uses the following designations after his name: ASA (Accredited Senior Appraiser, Designated in: Business Valuation, American Society of Appraisers); CBA (Certified Business Appraiser, Institute of Business Appraisers); AVA (Accredited Valuation Analyst, National Association of Certified Business Analysts); FCBI (Certified Business Intermediary, Fellow, International Business Brokers Association); CM&A (Alliance of Mergers & Acquisition Advisors); and CMP (Certified Medical Planner, Institute of Medical Business Advisors, Inc.).  *See* Cimasi Report, Appendix A.

[17]Further, Cimasi's benchmarking analysis measured only one year's performance for all of the companies involved, including Addus.  On rebuttal, defendants' expert, Peltz, testified that the standard way of performing a benchmarking analysis would be to analyze three years of data.  *See* Tr., November 17, 2005, at p. 28.  Cimasi's failure to do so further exacerbated the negative effect of the nonrecurring expenses being included in Addus's performance measures because all of the experts testified that at least a portion of the operating expenses on Addus's 2001 financials were attributable to the previous two years.

Addus substantially contributed to the unreliability and resulting inadmissibility of his DCF and GCV analyses.

## II.    The Discounted Cash Flow Analysis

The discounted cash flow method measures "the present value of the anticipated future economic benefits of ownership" of the company.  Tr., Aug. 8, 2005, at p. 65. Specifically, valuation under the DCF method entails projecting a future stream of economic benefits, and then discounting that future economic benefit to reflect its present value.   Critical to the reliability of the results obtained from a DCF analysis is the determination and calculation of: (1) the future economic benefit to be measured, and (2) the rate at which that future benefit should be discounted to reflect its present value.

Using the DCF method, Cimasi determined that the value of 100% of the shares of Addus was $18,772,961.  This figure constituted 60% of his final determination that Addus was only worth $21 million at the time it entered into the sale transaction with Med D.  By the by, he offers no adequate explanation why this Court should not require equal weights to the results obtained by each of the three standardized methods. *See In re Exide Technologies*, 303 B.R. 48, 65 (Bankr. D. Del. 2003).[18]   It has not escaped the Court's attention to the fact that the values derived from applying the other two methods were higher than that from the DCF method.  By reducing the weights of the results from the other methods, once again he shoved the data to a lower value.   This Court is not prepared to adopt the suggestion in the plaintiffs' supplemental memorandum that it

---

[18]In *Exide*, the court rejected the business valuation expert's unequal weighting of the DCF and Comparable Company methodologies, and held when multiple methods are employed in a business valuation, each should be given equal weight in the valuation analysis.  303 B.R. at 65.

should either change the assigned weights or adopt the highest of the three values. Either the valuation is reliably prepared or it is not; this Court does not serve to control against the plaintiffs' expert witness' bias in order to save its case in chief.   If a court of record cannot rely upon its "officers" to ensure it that their retained experts prepare valuation reports in as objective and unbiased manner as can reasonably be achieved under the current state of the appraisal art, then those officers will suffer the adverse consequences from an excess of vigorous advocacy that impairs the truth-seeking duties of the court.   The whole point of experts is to assist the court in determining the relevant facts, not in adding to the court's burden in having to redeem unreliable testimony by its own lights.

## A.    The Cash Flow Projections

The future benefit Cimasi chose to measure was Addus' net cash flow.  There are two components critical to the determination of projected net cash flow:  (1) projected revenue, and (2) projected costs and expenses.

### 1.    The Revenue Projections

Cimasi based his revenue projections on two variables:   "(1) the projected increase/decrease in reimbursement for services, and (2) projected increase/decrease for services measured by the combination of utilization demand for services and market

share." Cimasi Report at Section 5, Page 3 of 28.[19]  While the actual increase in revenue for Addus was 34.76% from 1999 to 2000, and 11.24% from 2000 to 2001, his projected revenue increases for the prospective 5 year period were: 4.94% for years 1 & 2, 3.95% for year 3, and around 5% for years 4 & 5.[20]  He calculated projected revenue for Addus by applying these percentage increases to Addus's actual and projected revenue figures.[21]

The record is devoid of any meaningful support for use of these variables to project future revenue.  Cimasi did not give a detailed explanation of how he derived the increase/decrease percentages he used to project revenue.   More importantly, it does not appear that he took any other variables into account in projecting Addus's revenue for post acquisition years 1-5, such as the revenue generating characteristics of each segment of Addus's business or any future plans for the business.  The only characteristic of Addus's historical performance that he considered  in projecting revenue was Addus's actual 2001 revenue, without any adjustments or qualifications, upon which he added his increase/decrease projection percentages.

---

[19]Cimasi sets out his revenue projection calculations in Table 4 of his report.  Table 4 shows the historical revenue figures for the years 1999, 2000 and 2001, and his projected revenue calculations going five years forward.

[20] Cimasi's projected revenue calculations were as follows:  Years 1& 2 = -1% (decrease in reimbursement payments) + 6% (increase in utilization demand & market share) = 4.94% projected revenue increase; Year 2 = -1% (decrease in reimbursement payments) + 5% (increase in utilization demand & market share) = 3.95% projected revenue increase; Year 4 = 0% (decrease in reimbursement payments) + 5% (increase in utilization demand & market share) = 5% projected revenue increase; and Year 5 = 1% (increase in reimbursement payments) + 4% (increase in utilization demand & market share) = 5.04% projected revenue increase.  (The Court will assume the final revenue projection figures are the exact figures calculated, whereas some of the earlier calculations were rounded off.)

[21] For post acquisition year 1, Cimasi applied the 1st year projected revenue increase of 4.94% to Addus' actual revenue for 2001.  For post acquisition year 2, Cimasi applied the 2nd year projected revenue increase of 4.94% to the post acquisition revenue figure he calculated for year 1, etc.

2.        *The Projected Cost of Sales and Expenses*

The figure Cimasi arrived at for the projected cost of sales and operating expenses for Addus consisted of the weighted average of Addus's historical cost of sales and operating expenses and the corresponding industry average cost of sales and operating expenses,[22] which were obtained from the results of his benchmarking analysis, as follows:

(i) 1/3 of the projected cost of sales and operating expenses for Addus consisted of the weighted average of the actual historical cost of sales and operating expenses for Addus during the three years immediately prior to the sale.  The figures were weighted as follows:  50% for the 2001 figure; 30% for the 2000 figure, and 20% for the 1999 figure.

(ii) 2/3 of the projected cost of sales and operating expenses for Addus consisted of the industry average cost of sales and operating expenses, which was obtained from the results of Cimasi's benchmarking analysis. *See* Cimasi Report, Schedule 8, Col. Q, L 27.[23]

---

[22]Both expressed as a percentage of revenue.

[23] Cimasi made two separate projections for the cost of sales and expenses:  (a) the cost of sales and operating expenses, and (b) the cost of other expenses.  The figure arrived at for the cost of other expenses consisted only of the weighted average of the actual historical other expenses for Addus during the three years prior to the sale, using the same 50%-30%-20% weights as used for the actual historical performance portion of Addus' cost of sales and operating expenses. Although Cimasi did not explain why he did not include industry average figures in his calculation for these expenses, it appears these expenses are significantly lower than the figures obtained by Cimasi for the other expenses category for the benchmark companies.

Cimasi testified that in calculating the operating cost figures for the benchmarking companies, he excluded extraordinary and nonrecurring expenses, but he did not do so when calculating the same figures for Addus. *See* Tr., Aug. 29, 2005, at p. 35. Defendants argue that had Cimasi excluded nonrecurring events from Addus's operating costs, Addus would have compared more favorably to the benchmark companies.[24] Yet he provided no meaningful explanation for why he did not use Addus's normalized cost figures. To the contrary, he used an audited number which was decisively rejected by the plaintiffs' own accountant, R. Todd Neilson (Neilson).[25] The adjustments Cimasi failed to make exceeded $13 million dollars for 2001. This failure effectively wiped out what would have been a $13 million EBITDA. Accordingly, he did not properly apply the standard methodology in this case.[26]

---

[24] For example, if Addus's normalized cost structure was at or below the cost structure of the benchmarking companies, Cimasi's inclusion of Addus's actual cost structure (including the nonrecuring items) as a 1/3 component of the projected calculation artificially increased Addus's future costs. If Addus's normalized projected costs would have been below that of the benchmarking companies, this methodology artificially increased Addus's costs even further. The Court was not provided with enough information to make these determinations.

[25] Neilson's testimony was restricted to the issue of false representations in Addus's financial statements and he repeatedly testified that he was not a valuation expert.

[26] The Court also takes issue with Cimasi's reasons for using a 1/3-2/3 weighting scheme. Cimasi testified that he weighted his calculations in this manner to reflect the belief that once the company was under the control of new management, it would eventually have costs and operating expenses more in line with the industry average. According to Cimasi, this weighting reflects the belief that the typical investor would not have simply used the actual cost figures from Addus's historical performance in determining Addus's investment value, but would have instead derived a normalized cost structure for the company incorporating the industry average based on the knowledge that some of the expenses in 2001 were non-recurring expenses, and on the expectation that once the company was under new ownership, the cost of sales and expenses would eventually fall in line with the industry average. *See* Tr., August 29, 2006, at p. 81-99. As defendants point out, there is no support for the inference that new management would be able to achieve industry average costs. Cimasi does not even consider the feasibility of such an achievement, which may have justified weighting operating costs 2/3 in favor of industry average costs.

## B.    The Discount Rate

Calculation of the appropriate discount rate is critical to obtaining reliable valuation results from the DCF method.  The DCF method places a value on the total invested capital of the subject entity, which includes the cost of both debt and equity. Thus, the rate that Cimasi used to determine the present value of the future stream of net cash flow from Addus was derived using a rate that reflected the weight and cost of both debt and equity of the company.[27]

### 1.    The Cost of Equity

In determining the cost of equity, Cimasi took a number of factors into consideration, including the results of his benchmarking analysis.[28]  After considering all of these factors, he concluded the cost of equity for Addus was 20.63%.[29]

---

[27] This rate is called the weighted average cost of capital (WACC), and represents the rate of return an investor would have expected to receive after purchasing Addus.  The formula used to calculate the WACC is as follows:

$$WACC = (Kc * Wc) + (Kd[1-t] * Wd)$$

Where: Kc = Cost of Equity; Wc = Weight of Equity; Kd = Cost of Debt; t = effective tax rate; Wd = Weight of Debt.

[28] The specific factors Cimasi took into consideration included:  the risk-free 20-year bond rate (5.77%); the equity risk premium, which represents the extra return that is expected by the typical investor, above the risk-free bond rate, when investing in large company stocks, such as S&P 500 companies (+5.9%); a healthcare industry risk premium for home health services (-4.34%); a small public company risk premium, which represents the extra return expected by the typical investor, above the risk-free bond rate and the equity risk premium, when investing in small company stocks, such as those in the 9th and 10th deciles of the S&P 500 (+3.3%); and the subject entity specific risk premium, which represents the extra return that would be expected by the typical investor if they invested in this specific company (+10%).

[29] The cost of equity was calculated as follows:  The risk-free 20-year bond rate (5.77%) + the equity risk premium (5.9%) + the healthcare industry risk premium for home health services (-4.34%) + the small public company risk premium (3.3%) + the subject entity specific risk premium (10%) = 20.63%

Of this 20.63%, Cimasi attributed 10% to the risk associated with this particular company, which he called the subject entity specific risk premium.  This premium was made up of five separate elements, three of which are wholly unjustified as either duplicative or based on his flawed benchmarking analysis.[30]

Three percentage points of the 10% represented what Cimasi called an operational performance risk, or  the added risk associated with Addus's poor performance *when compared to the benchmarking companies*.  As stated earlier, his benchmarking analysis was fatally flawed.    Another 3% was added for the risk associated with reimbursement, which was already accounted for in his computation of projected revenue, which was based in part on his calculated percentage projections for the increase/decrease in reimbursement for services.  He added another 1% to account for market competition risk, which was also accounted for in his revenue projections that specifically accounted for the increase associated with the future demand for services and the expected increase in market share.  Thus, at least 7 percentage points of the 20.63% calculated as the cost of equity for Addus is based on a flawed application of the methodology.

---

[30]This risk premium included the following elements:  operational performance risk, which reflected how unfavorable Addus compared to the benchmarking companies used in Cimasi's Benchmarking analysis (3%); depth of management, based on Cimasi's review of the case file and deposition testimony, which revealed what he considered concerns over oversight of certain divisions (1%); market competition risk, which revealed significant competition among 5000-7000 local and regional suppliers (1%); the financial condition of Addus, based on Cimasi's review of the case file and deposition testimony, which he believed revealed significant financial and management inconsistencies in Addus's financial and reporting systems (2%); and reimbursement risk, which reflected what he determined was the expected effect of the significant changes to the Medicare reimbursement system on Addus ( 3%).

2.      *The Cost of Debt*

The actual cost of Addus' debt was 4.28%.  Cimasi added 12% to that number to account for the fact that Addus' debt was personally guaranteed by its principal, Andrew Wright.  According to Cimasi, "it is reasonable to assume that in the absence of those guarantees that there would be an incremental rise in the cost of debt attributable to the hypothetical sale of [Addus]."  Cimasi Report, Section 5, p. 19 or 28.  Thus, the cost of debt used in his WACC calculation was 16.28%.

There is simply no justification for the addition of 12% to the cost of Addus's debt simply because Wright personally guaranteed the debt.  There is no reason to believe that a hypothetical purchaser would pay an additional 12% to extend the same credit to Addus.  Indeed, other than Cimasi's testimony that the going rate for a company like Addus would have been around 16%, there is no other evidence to support the conclusion that 12% should be added to the cost of debt because of Addus's debt structure.[31]

Moreover, there is nothing in the literature that sets forth the criteria for imposing any adjustments for a personal guaranty when comparing the cost of debt for a public company with the cost of debt for the subject private company.  In this respect, there is no peer recognized technical knowledge for computing the cost of debt when there is or is not a guarantee by the controlling shareholder(s).  Further, it is inconsistent with the

---

[31] Had Cimasi used a rate closer to Addus' actual cost of debt (4.28%), the results would have differed significantly because he would have calculated a lower discount rate, which would have yielded a higher present value for Addus.

practical reason for insisting upon guarantees as a "credit enhancement," namely, the strong incentive to induce the principal to attend to the business, to ensure the timely performance of the reporting requirements and of the other loan agreements.

The arbitrary addition of 1200 basis points to the cost of debt component of the discount rate is a fatal flaw in the application of the DCF method that in and of itself renders Cimasi's DCF analysis unreliable and therefore inadmissible.[32]

### C.    The Terminal Period

The DCF method is typically applied over two separate time periods, a discreet number of years going forward and a terminal (perpetual) period that represents the remainder of time the company is owned.   Determination of the rate applied to this terminal period is critical to obtaining an accurate value of the business using the DCF method.

Cimasi used the Gordon Growth Model to place a value on the remaining period of ownership after post acquisition year 5, "under which the net cash flow from the final period [wa]s 'grown' by the selected growth rate of four percent." Cimasi Report,

---

[32] Cimasi concluded that the WACC (discount rate) was 14.32%.(WACC = (20.63% * 39.33%) + (16.28%[1-37.17%] * 60.67%) = 14.32%). He determined the weight of equity (Wc) and the weight of debt (Wd) by calculating the weighted average of Addus' capital structure and the industry average capital structure, which was based on his benchmarking analysis as follows: 33% to Addus's capital structure (82.24% debt) and 67% to the average industry capital structure (49.88% debt), *see* Cimasi Report, schedule 3, Col. Q, L. 46, which yielded Wd = 60.67% and Wc = 39.33%. The effective tax rate for Addus was 37.17%.  Cimasi attributed his choice of weighting method to the notion that a purchaser in control of the company would have the power to change the capital structure of the company to be more in line with industry average.  Again, this assumption is based on the industry average capital structure derived from the flawed benchmarking analysis, which consisted of primarily public companies and does not consider the particularities of this private entity.  Thus, this assumption is not supported for this particular entity.

Section 5, at p. 21 of 28.[33]   The Court was never provided with an explanation of why the rate of 4% was used as a growth rate in the terminal period.   He testified that he considered this rate "conservative in that we recognized that this was a huge growth industry."  Tr., August 26, 2005, at p. 163.   He never explained why he felt the need to use a conservative figure in valuing a business in what he described as a huge growth industry.   He has simply not given the Court enough information to determine whether the 4% growth figure used was a reliable figure.   In light of all of the other flaws in applying this method, the Court cannot simply give deference to professional judgement in determining the growth figure in this instance, which represented over 70% of his value determination under the DCF method.

### D.       The Control Premium

A control premium is the value attributed to a premium the typical investor would be willing to pay for a controlling share in the company.   Cimasi chose to add a 10% control premium to the DCF value he calculated for Addus, which he claimed represented the percentage an average investor would be expected to pay as a premium to purchase 100% of the shares of Addus.

---

[33] The cash flow figure obtained was then capitalized at a rate of 10.32%, and then discounted back to the present value at the discount rate of 14.32%.  ( The capitalization rate is the discount rate minus the growth rate:  14.32% - 4% = 10.32%.)  The value obtained for this terminal period was $40 million, which represented over 70% of the value Cimasi obtained for Addus under the DCF method.  *See* Cimasi Report, Section 5, at p. 22 of 28; *see also* Tr., Aug. 29, 2005, at pp. 122-23.

Cimasi used data obtained from Mergerstat Review[34] and Control Premium Study[35] in determining the control premium that should be attributed to the value of Addus. Both studies report control premiums for publicly traded stock. The Mergerstat study revealed a weighted mean control premium paid in healthcare transactions from 1994 to 2001 of 34.9%.[36] The Control Premium Study revealed a weighted mean control premium paid in healthcare transactions from 1996 to 2001 of 31.1%.[37] Notwithstanding the industry means revealed by these studies, he determined that "given the facts and circumstances of [Addus] and the public market for the home healthcare industry segment within which it operates," the control premium for Addus should be below the mean. Cimasi Report, Section 5, at p. 10 of 28. Therefore, he concluded that a control premium of 10% was more appropriate.

Cimasi failed to adequately explain why such a low premium was justified. He attempted to attribute the low premium to what he perceived to be a poor quality senior management team. However, even if a poor quality management team was reflected in the marginal EBITDA before adjustments for normalized earnings, once it is reflected there, it cannot be double-counted by reducing the control premium. More importantly, there was no showing that he had any expertise in evaluating the quality of management. Even if he had such expertise, no foundation was explicitly laid for him to establish that expertise, and then apply that expertise in determining the control premium.

---

[34]By Applied Financial Application, LP

[35] By Mergerstat.

[36] 102 transactions were analyzed between 1994 and 2001 as follows: 14 in 1994; 11 in 1995; 19 in 1996; 24 in 1997; 16 in 1998; 9 in 1999; 5 in 2000; and 4 in 2001.

[37] 60 transactions were analyzed between 1996 and 2001 as follows: 15 in 1996; 21 in 1997; 8 in 1998; 5 in 1999; 4 in 2000; and 7 in 2001.

Further, to the extent there purports to be any empirical data on the real range of control premiums, Cimasi did not establish that this data and any inferences drawn from the data have reached the level of peer-recognition as an accepted methodology. A passing reference to some limited studies does not establish that this methodology or his application of the methodology has reached the level of a standardized technique or specialized knowledge.

Chartwell argues that even if the control premium was not applied, Cimasi's valuation analysis would not significantly differ, so a flawed application of the control premium should not materially alter this Court's determination. Chartwell misses the point. As a gatekeeper, this Court must look to the methodology used and its application, not the ultimate outcome, and where application of the methodology is fatally flawed, as here, the Court must exclude the evidence, regardless of its effect on the ultimate outcome.

### E.    The Discount for Lack of Marketability

A discount for lack of marketability reflects the added risk associated with investing in a company whose shares are not publicly traded, and are therefore not as liquid as the stock of a company freely traded in the public marketplace. According to Cimasi, discounts for lack of marketability are often applied to private closely held companies such as Addus. Thus, he decided to deduct a 30% discount to the value he calculated for Addus under the DCF method, which he claimed represented the

percentage an average investor would discount the value of 100% of the shares of Addus because it is not as marketable (or liquid) as a company trading in the public arena.

Cimasi reviewed three types of studies in order to determine the appropriate discount to apply to the value of Addus: (1) restricted stock studies;[38] (2) two studies done on the discounts attributed to businesses just prior to their initial public offering;[39] and (3) analysis of the PE ratio of public and private companies from the Mergerstat Review.[40]    The average discount from each of these studies was: (1) 28% from the restricted stock studies;[41] (2) 47% from the Emory Studies and 52% from the Willamette Studies; and (3) 18.5% (weighted mean) from the Mergerstat PE ratio data.

Cimasi also considered a number of other factors in determining what discount to apply to Addus, such as: (1) no real prospects for a public offering; (2) control value was 100%; (3) financial performance as compared to the industry average; and (4) market for home health care transactions. After reviewing all of these factors, he concluded that a discount for lack of marketability of 30% should be applied to the value of Addus.

Cimasi's application of a discount for lack of marketability is counterintuitive for several reasons. First, it imposes a hypothetical model in which the controlling shares would have to be freely tradable within a severely truncated period of time - two or three business days at most - in order to approximate the trading practices of minority shares of

---

[38] Cimasi looked at 14 different studies dating from 1966 to 1998, and reporting on over 1500 transactions, cumulatively.

[39] The two studies were: (1) the Emory Studies (also known as the Baird & Co. Studies) (1980-2000), and (2) Willamette Management Associates Studies (annual results from 1975 to 1995).

[40] 1994-2001.

[41] Only one of the restricted stock studies was done after 1997, when the SEC Rule requiring a holding period before restricted stock can be freely traded reduced the period of time from 2 years to 1 year. This study, done by Columbia Financial Advisors (May 1997-1998), yielded a discount of only 13%.

publicly held companies.  This is clearly an impracticably impossible standard to meet. So the foundational premise for attributing a lack of marketability builds in a very severe diminution in the value of the privately held shares.  In this sense, the theory is entirely suspect and inherently unreliable.

Second, there was no need to impute a lack of marketability for the subject company because Addus had been marketed for over a year by an investment banking firm in England and another firm in the U.S., so there was already company-specific data on this issue, which was completely ignored by Cimasi.  There is also the undeniable fact that the shareholders already had a buyer for their shares under the Stock Purchase Agreement with Med Diversified.  Although the plaintiffs mocked the SPA as terribly overpriced and made disparaging references to the history of overpayments by Med D for its prior acquisition, the relevancy of those alleged facts to this issue was never the subject of any testimony in this trial.

Moreover, even if a discount were appropriate, the consensus in the financial valuation community of experts only favors use of the studies used by Cimasi to determine a discount for lack of marketability of minority, and not controlling, interests. Further, he has already accounted for the financial health of the company and the market for home health care in the underlying DCF analysis.  There would be no basis for further discounting the numbers except to further depress the value of Addus.

## III      The Other Valuation Methods Used


### A.      The Guideline Company Valuation Method


The Guideline Company Valuation (GCV) method "analyzes historical transactional data to develop several transactional ratios of shares of common stock in publicly traded companies that are similar to the subject entity."  Cimasi Report, Section 5, at p. 22 of 28.  These ratios are then applied to corresponding company measures to arrive at a value for the company.


Using the GCV method, Cimasi measured the following ratios from a database of 13 publicly traded healthcare companies: (1) MVIC[42]/Revenue and (2) MVIC/EBITDA.[43] The 13 publicly traded healthcare companies chosen by Cimasi were those he considered similar to Addus.  He then assigned a weight to each ratio based on his determination of how similar the company was to Addus (i.e., revenue size, scope of services, etc.), as reflected in his benchmarking analysis. Tr., August 29, 2005, at p. 258.   He then calculated a weighted mean, median, high & low, upper & lower quartile value for each of the ratios.


The final determination of what ratio value to apply was chosen differently for each of the ratios.  For the MVIC/Revenue multiple, Cimasi used a value of 0.32, which represented the value corresponding to ½ of the 1st percentile of the MVIC/Revenue values calculated.  His explanation for using this number was that both Addus' actual

---

[42] MVIC = Market Value of Invested Capital, which is:  market value of common stock (stock price per share X outstanding shares) +  value of preferred shares + interest bearing debt.
[43] EBITDA = Earnings before Interest, Taxes, Depreciation and Amortization.

2001 operating margin (-1.95%), and its 3-year normalized operating margin (0.63), were below the range of the 2001 operating margins of the guideline companies. *See* Cimasi Report, Schedule 10, n. 2.   In other words, Addus' operating margin was not even on the chart, so he gave it a value equal to just about the lowest value he could in line with all of the others.  When the Court voiced its concern that since Addus was not even on the chart with these companies it may not be comparable, his response was to state that this is an accepted technique to place Addus within the statistical data.  Tr., August 29, 2006, at p. 272.   He then multiplied the MVIC/Revenue multiple of .32 by Addus's 2001 net revenue of $234,070,611, which yielded a value of $75,531,942 for the company.

In calculating a value for MVIC/EBITDA multiple, Cimasi used a value of 7.56, which represented the value corresponding to the 14.20 percentile of the MVIC/EBITDA values calculated.   His explanation for using this number was that Addus's 3-year weighted average operating margin (0.63) was the 14.20 percentile of the 3-year weighted average operating margin for the guideline companies.  *See* Cimasi Report, Schedule 10, n. 3.   He then multiplied the MVIC/EBITDA multiple of 7.56 by an EBITDA figure calculated for Addus of $6,634,607,[44] which yielded a value of $50,148,558 for the company.

Cimasi did not explain why he used two different time periods of comparison in choosing the two different multiples.  No particular rationale was given for choosing the MVIV/Revenue multiple by comparing Addus's operating margin to the one year (2001)

---

[44] The EBITDA figure used here was derived by multiplying the weighted average EBITDA of the company as a percentage of net revenue for the years 2001, 2000, and 1999, which was 2.83%, by the company's 2004 net revenue of $234, 070,611.  The weighting was 50-30-20 for the years 2001-2000-1999.

operating margin of the guideline companies, and then choosing the MVIC/EBITDA multiple by comparing Addus's operating margin to the 3-year weighted average operating margin of the guideline companies.

After calculating a separate value for the company using each of the multiples, Cimasi then assigned a weight to each value: 60% for the MVIC/Revenue multiple and 40% for the MVIC/EBITDA multiple, which yielded a value of $65,378,588. When asked why he chose to weight the results of each multiple 60%-40%, he responded that he placed greater weight on the revenue multiple because "revenue is a little cleaner number." Tr., August 29, 2005, at p. 273. In other words, less adjustments are made to this number. *Id.* at 274. He then subtracted interest bearing debt ($31,471,841), to arrive at a value of $33,906,747.

As with the DCF method, and for the same reasons, Cimasi then added a 10% control premium, and subtracted 30% as a discount for lack of marketability, to arrive at a final value under the GCV method of $26,108,195. This figure constitutes 30% of the weight of his final determination of the value of Addus.

The low multiples Cimasi used in calculating the value of Addus under the GCV method are the result of a flawed analysis. In particular, there are obvious inconsistencies in calculating the multiples he used as the percentiles used in choosing each multiple were different, even though they were based on the same data. No doubt this is because these multiples were chosen based on a comparison of two different and inconsistent time periods.

Further, as stated earlier, Cimasi's failure to normalize the data for Addus is a fatal flaw in his methodology. In this instance, the weights assigned to each of the guideline companies in calculating the multiples were based on his benchmarking analysis, which compared Addus's non-adjusted figures to the normalized figures of a small database of primarily publicly owned companies. Further, his determinations of what ratios to use were based on Addus's unadjusted operating margin. As a result, the methodology he used was flawed.

### B.    The Comparable Transactions Approach

The Direct Market Comparable Transaction (DCT) method compares actual transactions involving similar companies to the company at issue to in order to place a value on the company. This method is based on the premise that "the cost of an equally desirable substitute, or one of equal utility, tends to set the ceiling of value" for the company. Cimasi Report, Section 5, at p. 24 of 218. Using this method, Cimasi analyzed transactions he determined were comparable, calculated the ratios or multiples based on those transactions, and then applied those multiples to Addus.

The transactions used by Cimasi in his analysis included 11 healthcare transactions he identified as similar to Addus. A purchase price/revenue (P/R) multiple was then calculated for each. All P/R multiples that fell outside two standard deviations from the mean of the P/R multiples calculated for all of the companies were then excluded from consideration. This resulted in the exclusion of one of the transactions in which the P/R multiple fell more than 2 standard deviations above the mean. A median

P/R value of 0.23 was then calculated from the other 10 companies. This was then applied to the Addus' 2001 revenue of $234,070,611, which yielded a value of $54,616,476.

Cimasi did not apply a control premium to his results from this method because the results are based on actual transactions, which presumably incorporate any such premium. *Id*. at p. 25 of 28. For the same reason, he did not apply a 30% discount for lack of marketability, however, he did apply a 10% discount for lack of marketability "based upon a proxy for the transactional costs, e.g., accounting costs, legal costs, appraisals, management time and brokering fees, related to the hypothetical sale of the subject entity." *Id.* His final determination of the value of Addus under the DCT method was $20,830,171.

There are several reasons why Cimasi's analysis under the DCT method is flawed. First and foremost, the transactions chosen by him were not comparable to Addus. In particular, the revenues reported for the companies involved in those transactions ranged from $700,000 to $87 million, as compared to Addus's $234 million. In addition, the purchase price of those companies was only $180,000 to $57 million. He excluded as beyond 2 standard deviations the transaction closest to Addus (for $120 million) as an outlier. When questioned about the comparability of these transactions, he essentially testified that incompatibility was one of the reasons he chose to give the results of this method only a 10% weight in his final calculation of the value of Addus. Tr., August 29, 2005 at pp. 228-33.

Second, as stated above, by excluding outliers beyond 2 standard deviations, Cimasi excluded the only transaction that may have been truly comparable to Addus. Moreover, he chose to exclude outliers under this method even though he did not choose to exclude outliers under the GCV method, notwithstanding the fact that the database he considered in this instance had only 11 transactions that he chose because they were comparable. If they were truly comparable, he would not have needed to exclude outliers from such a small sample size.

Finally, Cimasi's application of a 10% discount for lack of marketability is completely unsupported. The Court notes that he did not apply a control premium precisely because these are actual market transactions that take into account any premium paid. The same reasoning should apply to a discount. Moreover, as defendants point out, there is no reason to believe transaction costs are not included in the transactions reported. Thus, there is no support for his application of a 10% discount for marketability under this method.

## Conclusion

As the foregoing demonstrates, the deliberate, manifest, pervasive and systematic bias on Cimasi's part in applying the standard methodologies for estimating the total enterprise value of Addus warrants disqualifying him and his report on the principal ground of unreliability. As a result, the defendants' cross-motion *in limine* is granted in its entirety, and the expert testimony and report of Robert Cimasi is stricken from the record as unreliable and therefore inadmissible.

Plaintiffs' counsel argues in its supplemental post-trial memorandum that this Court should undertake to redeem Cimasi's report by substituting Neilson's computation of EBITDA and ignoring the negative adjustments to the discount rate and then running the substituted variables in the formula.  First, it is not the function of this Court to fix the errors in an expert's report in order to save it for purposes of admission.  Either the expert properly applies the standard methodologies or he does not.  If he does, the report may be admitted.  If he does not, it cannot be admitted.  Second, Neilson repeatedly testified he was not a valuation expert.  He *only* testified about whether there were fraudulent representations in the projected EBITDA as of the end of the third quarter of 2001.  To reach this conclusion, he testified that the adjustments to the 2001 year-end audit could not be found to be one-time non-recurring adjustments.  He further testified that in his judgment the financial statements for 1999, 2000, 2001, and 2002 would have to be materially restated.

Under the totality of the circumstances, this Court does not believe that it falls within the sound exercise of its discretion to redo Cimasi's patently unreliable report. This may be a stiff dose of medicine for the plaintiffs to swallow, but it should serve as a warning to other litigants in future constructive fraudulent transfer cases to make sure that their experts apply the standard methods correctly lest they find their experts' reports

denied admission.  For if they do not heed this stricture, they may not have any evidence in the record to sustain their burden of proof to avoid the alleged constructive fraudulent transfers.

**SO ORDERED.**

Dated: Central Islip, New York
        August 2, 2006

                                        _s/Stan Bernstein_
                                        Stan Bernstein
                                        United States Bankruptcy Judge